UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FRIENDS OF ANIMALS,<br><br>                              Plaintiff,<br>v.<br>DEBORAH HAALAND, *et al.*,<br><br>                              Defendants. | Case No. 3:22-cv-00365-ART-CLB<br><br>ORDER |

Plaintiff Friends of Animals, a non-profit corporation, brings this action against Defendants Deborah Haaland, the Secretary of the Interior, and the United States Bureau of Land Management ("BLM"), alleging that Defendants violated various federal laws when they approved a contract for a new off-range corral ("ORC") on private land near Winnemucca, Nevada to contain and feed up to 4,000 wild horses and burros. Now pending before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 26, 34.) For the reasons stated, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

## I.     FACTUAL AND PROCEDURAL HISTORY

This litigation centers on BLM's approval of a contract for a new ORC in Winnemucca, Nevada.

BLM manages the nation's public lands. 43 U.S.C. § 1732(a). In 1971, Congress passed the Wild Horse Act ("the Act"), which "authorize[s] and direct[s] [BLM] to protect and manage wild free-roaming horses and burros as components of the public lands." 16 U.S.C. § 1333(a). Congress passed the Act in response to decreased wild horse populations. 16 U.S.C. § 1331. By 1978, the wild horse and burro population rebounded significantly, so Congress amended the Act "to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95–1122, 95th Cong.,

2d Sess. 23 (1978)). "The main thrust of the 1978 amendments is to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Id.*

Under the Act, BLM must "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Under this directive, BLM designates herd management areas and sets appropriate management levels for the wild horse and burro populations within each area. 16 U.S.C. § 1333(b)(1); 43 C.F.R. § 4710.3-1. The Act requires that BLM maintain a current inventory of wild horses and authorizes BLM to use a variety of methods to achieve appropriate management levels, including the removal of "excess animals." 16 U.S.C. § 1333(b)(1). The Act defines "excess animals" as those "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f).

To manage the overpopulation of wild horses and burros, BLM will remove, or gather, excess animals from the range and move them to short-term ORCs. 16 U.S.C. § 1333(a); AR 9427. An ORC is a short-term holding facility where excess animals removed from public lands are prepared for adoption, sale with limitations, or transfer to a long-term holding facility. AR 9492.

The BLM initiated the approval of the Winnemucca ORC in late 2020 when it solicited contractors to provide ORC space in Idaho, Nevada, and Utah that could accommodate 500 to 10,000 wild horses and burros BLM removed from public lands in the West. AR 9488. In response to the solicitation, JS Livestock submitted a proposal for an ORC that would hold 4,000 wild horses and burros on 100 acres of private land near Winnemucca. AR 19. BLM issued an "apparent awardee letter" to JS Livestock on August 3, 2021, stating it would be awarded the contract upon satisfaction of the necessary prerequisites,

including environmental review under the National Environmental Policy Act ("NEPA"). AR 10665-668; AR 9500.

BLM completed its preliminary environmental assessment ("Preliminary EA") on September 2, 2021. AR 53-75. BLM then made the Preliminary EA available online and opened up a fifteen-day public comment period, which was then extended for an additional fifteen days. Suppl. AR 76-77; AR 51-52. During the comment period, BLM received over 6,000 individual letters and emails raising concerns regarding, among other things: air quality (odors and dust), animal waste management, disposal of dead animals, groundwater contamination, disease transmission, public access to the facility, animal health and safety, climate change, social and economic values, previous litigation, environmental justice, flooding, grazing, NEPA process, water rights, and public health and safety. AR 29.

BLM issued the final environmental assessment ("EA") on November 3, 2021. AR 11-50. BLM also issued a finding of no significant impact ("FONSI") and a Record of Decision ("ROD"). AR 1-10. BLM concluded that no environmental impact statement ("EIS") was necessary because the Winnemucca ORC would not significantly impact the environment. *Id.*

BLM issued the contract for the ORC to JS Livestock on September 21, 2022, AR 10676-722, after JS Livestock obtained a Nevada Division of Environmental Protection ("NDEP") concentrated animal feeding operation ("CAFO") permit under 40 C.F.R. §§ 122.23, 122.42(e) and 412.13, AR 18-19. This lawsuit followed.

Plaintiff's Motion for Summary Judgment (ECF No. 26) argues that Defendants violated NEPA by failing to take a "hard look" at the environmental impacts of the Winnemucca ORC, failing to consider reasonable alternatives, and failing to prepare an EIS. Plaintiffs further argue that Defendants have violated the Wild Horse Act by failing to protect wild horses and burros and by

1  treating them inhumanely.

2  Defendants' Response and Cross-Motion for Summary Judgment (ECF
3  No. 34) argues that Plaintiff's claim under the Wild Horse Act is meritless and
4  that BLM's environmental review of the Winnemucca ORC complied with NEPA.
5  (ECF No. 34.) Defendants also allege that Plaintiff lacks standing for its claims.
6  Both parties filed responsive pleadings to the cross-motions for summary
7  judgment. (ECF Nos. 35, 37.)

## II. STANDARD OF REVIEW

All claims in this case are governed by the APA. 5 U.S.C. §§ 701-706. The APA requires courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law[.]" 5 U.S.C. § 706(2). "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000)). Review under the APA is limited to the administrative record that was before the agency at the time of its decision. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). A reviewing court may not substitute its judgment for the agency's. *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d at 1140. A court's task "is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. Plaintiff Has Standing to Bring Its Claims.

It is Plaintiff's burden to establish that (1) it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," not

"conjectural" or "hypothetical"; (2) the injury is fairly traceable to Defendants' challenged action, meaning there is "a causal connection between the injury and the conduct complained of"; and (3) it is likely that a favorable judicial decision will prevent or redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Here, Plaintiff argues it has "representational standing" to bring suit on behalf of its members because (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to Friends of Animals' purpose; and (3) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiff points to declarations from its members to show that its members have standing to sue in their own right. (ECF Nos. 26-1, 26-2, 26-3, 35-1, 35-2, 35-3.)

Plaintiff alleges injury in fact under two theories. First, Plaintiff's members allege injury to their aesthetic interests by seeing wild horses treated inhumanely at the Winnemucca ORC. Second, Plaintiff's members allege an injury to their aesthetic interest in observing wild horses on the range. Defendants argue that the aesthetic injuries alleged by Plaintiff's members are insufficient to confer standing.

"[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63. Plaintiff's members have an established cognizable interest in seeing wild horses treated humanely and in observing wild horses on the range. To establish injury in fact, Plaintiff's members must point to "specific facts" showing they will be "directly affected" by the challenged action, "apart from their special interest in the subject." *Id.* at 563 (internal quotation marks and omissions omitted).

Plaintiff's members have met their burden. Two of Plaintiff's members live

1 in Nevada and allege a deep connection to wild horses and burros throughout
2 Nevada and the West. (ECF No. 26-1 at ¶¶ 3-7; ECF No. 26-2 at ¶¶ 2-5.) They
3 feel compelled to check on wild horses and burros at the Winnemucca ORC and
4 have specific plans to do so. (ECF No. 26-1 at ¶ 9; ECF No. 26-2 at ¶ 8.) The
5 "concrete plans" included in the members' declaration are sufficient to support
6 a finding of an "actual or imminent" injury. *Lujan*, 504 U.S. at 564.

7 Plaintiff's members describe multiple conditions particular to the
8 Winnemucca ORC that are "inhumane and dangerous," including that the area
9 has "frigid winter weather" and "extreme heat in the summer," the soils in the
10 area are prone to flooding and dust which will harm wild horses and burros and
11 likely cause dust pneumonia, and the size and capacity of the ORC will "pose a
12 serious, unnecessary risk of infection and disease transmission that will likely
13 lead to suffering and death." (ECF No. 26-1 at ¶ 11; ECF No. 26-2 at ¶ 7-8.)
14 Seeing the animals at the Winnemucca ORC will cause them "great sadness"
15 and distress. (ECF No. 26-1 at ¶ 9; ECF No. 26-2 at ¶ 8.) Given these specific
16 allegations of inhumane conditions and plans to visit the Winnemucca ORC,
17 Plaintiff's members have established an imminent, concrete, and particularized
18 injury in fact to their aesthetic interests in observing wild horses and burros in
19 humane conditions.

20 The Court also finds a sufficient causal connection between the alleged
21 injury and the action Plaintiff is challenging. Here, Plaintiff is challenging
22 Defendant's decision awarding the Winnemucca ORC contract to JS Livestock.
23 But for that decision, Plaintiff's members would not be subjected to the alleged
24 injury to their aesthetic interests in observing wild horses and burros in
25 humane conditions.

26 Finally, a favorable outcome in this matter will likely redress or prevent
27 the alleged injury. Should this Court find in Plaintiff's favor, Plaintiff's members
28 will not be subjected to viewing wild horses and burros in allegedly inhumane

conditions. Thus, Plaintiff's members have established standing to sue in their own right. In addition, the interests at stake are germane to Plaintiff's interests in protecting animals, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. The Court therefore finds that Plaintiff has established "representational standing" to bring suit on behalf of its members.

### B. Defendants' Environmental Review Complied with NEPA.

"NEPA is at its heart a procedural statute and requires federal agencies to take a hard look at the environmental consequences of their actions." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (internal quotation marks omitted). NEPA requires federal agencies to "identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). The statute requires that agencies prepare a detailed environmental impact statement (EIS) before they undertake a major federal action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(C). If a proposed action is not likely to have significant effects or the significance of the effects is unknown, an environmental assessment (EA) is appropriate. 40 C.F.R. § 1501.3(c).

"The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a FONSI." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). "Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Id.* The EA must include "sufficient evidence and analysis" to determine whether the effects of the proposed action are significant enough to trigger an EIS. 40 C.F.R. § 1501.5(a), (c).

If an EA leads the agency to conclude that environmental impacts are

1  significant, the agency must prepare a detailed EIS. 40 C.F.R. § 1501.6(a)(3).
2  Alternatively, an agency may prepare a FONSI "if the agency determines, based
3  on the environmental assessment, that NEPA does not require preparation of an
4  environmental impact statement because the proposed action will not have
5  significant effects." 40 C.F.R. § 1501.6(a)(1). If the agency "decides not to
6  prepare an EIS, it must supply a convincing statement of reasons to explain
7  why a project's impacts are insignificant. . . . The statement of reasons is
8  crucial to determining whether the agency took a hard look at the potential
9  environmental impact of a project." *Blue Mountains Biodiversity Project v.*
10 *Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotation marks and
11 citation omitted).

12 Here, Plaintiff is challenging the sufficiency of Defendants' NEPA review of
13 the Winnemucca ORC contract. Defendants' NEPA review included a
14 Preliminary EA, which was published online and open for public comment.
15 Defendants then issued a Final EA, which included a FONSI and a final
16 decision awarding the contract for the Winnemucca ORC to JS Livestock.

17 According to Plaintiff, Defendants failed to take necessary "hard look" at
18 the environmental impacts of the Winnemucca ORC. Specifically, Plaintiff is
19 challenging the review for being rushed to comply with a contractual obligation
20 facing the contract awardee, for impermissibly relying on a state CAFO permit,
21 and for ignoring the impacts on wild horses and burros. Plaintiff also alleges
22 that Defendants failed to consider reasonable alternatives to the Winnemucca
23 ORC and failed to provide a convincing statement explaining how the effects
24 would be insignificant.

25 While Defendants were required to take a "hard look" at the
26 environmental impacts of the Winnemucca ORC, "[a]n agency's actions need not
27 be perfect." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir.
28 2003). "[A court] may only set aside decisions that have no basis in fact, and

not those with which we disagree." *Id.* Under the deferential standard of review mandated by the APA, the Court is satisfied that Defendants took the required "hard look" and that the decision was not arbitrary or capricious.

First, Plaintiff's claim that Defendants' environmental review was rushed lacks a sufficient basis in law. NEPA does not dictate any minimum time for conducting a NEPA analysis. The timeframe in which a "hard look" can take place is determined by the scope and complexity of the proposed action and agency staff's ability to complete the analysis. Plaintiff argues that BLM rushed its analysis to align with contractual obligations facing JS Livestock and points to emails showing conversations amongst BLM staff as evidence of the rushed environmental analysis. Compliance with NEPA, though, is not dictated by how long BLM's experts took to complete their analysis. It is also not damning for BLM to link its decision-making timeline to the contracting process for the proposed action. If Defendants had engaged in their NEPA review after awarding the contract for the Winnemucca ORC, then their review would be untimely. *See, e.g.*, *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) (construction contracts awarded before preparation of EAs). But that is not the case here. Moreover, BLM's environmental review included ample time for public comment and participation. The Court therefore finds that Plaintiff's argument about a "rushed" environmental review lacks merit.

Plaintiff's argument that Defendants improperly relied on a state CAFO permit when BLM issued its FONSI and final decision also fails. Plaintiff cites a recent Ninth Circuit decision for the proposition that "federal agencies [may not] rely on state permits to satisfy review under NEPA." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022). But *Env't Def. Ctr.* is distinguishable. There, the court found that the federal defendants improperly relied on a NPDES permit "to conclude that any impacts from offshore well stimulation treatments to the marine environment would be insignificant." *Id.*

1    The NPDES permit, though, "was not created or intended to be used for the
2    offshore well stimulation treatments at issue." *Id.* Further, the court found the
3    testing required by the NPDES permit "inadequate to measure the impacts of
4    well stimulation treatments because . . . testing is not conducted in conjunction
5    with the use of well stimulation treatments." *Id.* at 875. Finally, the court found
6    that the agencies relied on a "general permit . . . to evaluate the impacts from
7    specific well stimulation treatments," and the permit would have to be modified
8    to test for the fluids used in well stimulation treatments. *Id.* Because the
9    NPDES permit was issued by a different agency, the federal defendants had no
10   power to modify it. *Id.* Therefore, the court found that reliance on the NPDES
11   permit was improper. None of these circumstances are present here.

12   First, the CAFO permit is well-established and is designed to specifically
13   address the precise impacts of an animal operation such as such the
14   Winnemucca ORC. There is no dispute that the Winnemucca ORC is defined as
15   a CAFO and is therefore subject to the more stringent regulations applicable to
16   such a facility. *See* AR 8567 (defining facility that holds at least 500 horses as a
17   "Large CAFO"). Second, the fit between the permit and the regulated activity is
18   perfect because the effluents of a horse corral are precisely the type of discharge
19   the CAFO permit is designed to prevent. Third, no modification to the CAFO
20   permit is required because it is not a general permit, but one that is tailored to
21   specifically address the exact type of animal facility at issue. The Court
22   therefore finds that reliance on the CAFO permit was reasonable under these
23   circumstances.

24   Plaintiff's other "hard look" arguments are unavailing. BLM addressed
25   potential impacts of flooding by not only making compliance with the CAFO
26   permit a mandatory requirement of the contract, but also by recommending
27   additional measures to prevent runoff in the event of a 100-year flood. AR 3, 29.
28   The administrative record also reflects that Defendants considered groundwater

1    impacts. AR 6009-10. Finally, the administrative record shows that Defendants
2    also considered specific conditions of the soil at the Winnemucca ORC and how
3    the ORC will impact such soil. AR 26, 61-62. The Court thus finds that
4    Defendants completed an adequate NEPA review.

5        In addition, contrary to Plaintiff's arguments, Defendants adequately
6    considered the effects of the Winnemucca ORC on any wild horses and burros
7    that will live there. The EA explains that "[p]er the conditions set out in the
8    Solicitation, the ORC facility would be required to [h]andle, treat, and maintain
9    all WHB in a humane manner in accordance with BLM guidance and policies,
10   including Permanent Instruction Memorandum (PIM) 2021-002, Wild Horse and
11   Burro Comprehensive Animal Welfare Program (CAWP)." AR 19. The standards
12   set forth in the PIM and CAWP are not at issue in this NEPA challenge. Thus,
13   Defendants considered the effects of the Winnemucca ORC on wild horses and
14   burros and applied reasonable, established standards of care.

15       The Court also finds that Defendants considered a reasonable range of
16   alternatives. "Agencies do not have to consider infinite, unfeasible, or
17   impractical alternatives, but they must consider reasonable ones." *Env't Def.*
18   *Ctr.*, 36 F.4th at 877. The range of alternatives is dictated by the nature and
19   scope of the proposed action. *Alaska Wilderness Recreation & Tourism Ass'n v.*
20   *Morrison*, 67 F.3d 723, 729 (9th Cir. 1995). "Whether the range of alternatives
21   considered is reasonable is to some degree circumscribed by the scope of the
22   statement of "'purpose and need.'" *Env't Def. Ctr.*, 36 F.4th at 876 (quoting
23   *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir.
24   2004)). "Agencies enjoy a good deal of discretion in framing the purpose and
25   need of an EA or EIS, but the statement cannot unreasonably narrow the
26   agency's consideration of alternatives so that the outcome is preordained." *Id.*
27   (internal quotation marks, citation, and omission omitted).

28       Here, the decision under consideration was whether to proceed with a

11

1    contract for an ORC. The need for the proposed action as stated by BLM is "to
2    provide the holding space necessary to safely and humanely care for excess
3    WHB removed from public lands consistent with authority provided in Section 3
4    of the WFRHBA." AR 17. BLM's framing of the need statement is not
5    unreasonably narrow. It is properly tailored to the scope of the decision under
6    consideration. It also does not lead to a preordained conclusion, so long as BLM
7    adequately considered the alternative of no action. 40 C.F.R. § 1502.14(c).

8        Here, Defendants properly considered the no action alternative. The EA
9    explains that under the no action alternative, the project site would not be
10   impacted because there would be no change to the local environment due to
11   any federal action. AR 28. This consideration is sufficient under NEPA.

12       Plaintiff's argument that consideration of only the proposed action and
13   the no action alternative was insufficient is incorrect. "The statutory and
14   regulatory requirements that an agency must consider 'appropriate' and
15   'reasonable' alternatives does not dictate the minimum number of alternatives
16   that an agency must consider." *Native Ecosystems Council v. U.S. Forest Serv.*,
17   428 F.3d 1233, 1246 (9th Cir. 2005). "The regulation does not impose a
18   numerical floor on alternatives to be considered." *Id.* "So long as all reasonable
19   alternatives have been considered and an appropriate explanation is provided
20   as to why an alternative was eliminated, the regulatory requirement is
21   satisfied." *Id.* (internal quotation marks omitted).

22       Here, the scope of the decision considered and the need for the proposed
23   project make it reasonable for BLM to only consider granting the contract or not
24   granting the contract. Analysis of alternatives for issuing a contract with
25   different terms and requirements falls outside the purpose and need. Similarly,
26   Defendants were not required to analyze alternatives that would address
27   Plaintiff's proposed need of "providing more space" for wild horses and burros.
28   Here, Defendants needed only to consider alternatives that achieved the stated

purpose of providing "holding space." Defendants acted reasonably in declining to consider proposed alternatives that are either redundant or not compatible with the purpose of the proposed action. Given the narrow nature and scope of the proposed action, the Court finds that Defendants considered a reasonable range of alternatives.

Finally, Defendants provided an adequate and convincing statement supporting the FONSI. AR 7-10. In considering the potentially affected environment, agencies should consider the affected area and its resources. 40 C.F.R. § 1501.3(d)(1). In considering the degree of the effects, agencies should consider: (i) short-and long-term effects; (ii) beneficial and adverse effects; (iii) effects on public health and safety; and (iv) effects that would violate Federal, State, Tribal, or local law protecting the environment. 40 C.F.R. § 1501.3(d)(1), (2). Here, BLM considered these factors as required by the CEQ regulations and concluded that the proposed action would not cause significant environmental impacts. AR 7-10. BLM therefore was not required to prepare an EIS.

Plaintiff argues that Defendants prepared a "mitigated FONSI" which required a more robust discussion of the proposed mitigation measures in order to satisfy NEPA. Plaintiff is incorrect. "[A]n agency may incorporate mitigation into the project design so that significant impacts are avoided, rather than mitigated after the project is developed." *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1052 (D. Nev. 2015), *aff'd sub nom. W. Watersheds Project v. Ruhs*, 701 F. App'x 651 (9th Cir. 2017) (citing *Envtl. Prot. Info. Ctr. v. Forest Service,* 451 F.3d 1005, 1015 (9th Cir. 2006)). "In such situations, the agency need not separately evaluate whether mitigation adopted after the fact would reduce impacts to a level of non-significance." *Id.* Here, Defendants incorporated mitigation, including the required CAFO permit, into the project design so that significant impacts are avoided, rather than mitigated after the fact. Thus, Defendants did not need to separately evaluate mitigation measures adopted

13

after the project was developed.

The Court therefore finds that Defendants provided a convincing statement supporting the FONSI and that no EIS was required. Thus, Defendant's environmental review of the Winnemucca ORC complied with the requirements of NEPA.

### C. Defendants Have Not Violated the Wild Horse Act.

The Wild Horse Act requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Act's implementing regulations require BLM to manage wild horses and burros "as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a). The regulations define humane treatment and inhumane treatment. *See* 43 C.F.R. § 4700.0-5(e) ("Humane treatment means handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro."); 43 C.F.R. § 4700.0-5(f) ("Inhumane treatment means any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community."). The regulations prohibit "[t]reating a wild horse or burro inhumanely." 43 C.F.R. § 4770.1(f).

Plaintiff argues that Defendants' decision to issue a contract for the Winnemucca ORC violates the Wild Horse Act's mandate to protect wild horses and burros and violates the prohibition on treating wild horses and burros inhumanely. Thus, under the APA, Plaintiff asks this Court to "set aside" the challenged agency action because it is "not in accordance with law." 5 U.S.C. §§ 706(2), (2)(a).

14

1 Defendants contend that Plaintiff is inappropriately challenging BLM's separate excess determinations and gather decisions for herd management areas on public land. Further, Defendants argue that even if Plaintiff's challenge is relevant to the Winnemucca ORC contract decision at issue, BLM's established standards for care of animals in ORCs are humane and reasonable. Without reaching Defendants' first argument, the Court agrees with Defendants and finds that BLM's established standards for care are humane and reasonable.

Plaintiff cites various veterinary experts to establish that the conditions at the Winnemucca ORC will be inhumane and points to specific conditions that will allegedly lead to unnecessary harm and suffering for wild horses and burros kept there. (ECF No. 26 at 36-40.) But the record shows that the Winnemucca ORC will meet the standards of care mandated under the Comprehensive Animal Welfare Program ("CAWP"), informal guidance developed by BLM to ensure consistent humane treatment of wild horse and burros in BLM's care. *See, e.g.,* AR 19-20, 38, 9546-47, 9543-65, 10682-84. Additionally, the terms of the contract provide that a contracting officer from BLM will ensure the ORC complies with the established standard of care under the CAWP. AR 9501.

Plaintiff's arguments essentially challenge the standards of care in the CAWP as incompatible with the Wild Horse Act. The issue before this Court is BLM's issuance of a contract for the Winnemucca ORC. The Court is satisfied that BLM's reliance on the CAWP for the standard of care in the Winnemucca ORC was reasonable under the circumstances and will defer to the agency's judgment on what constitutes humane treatment. *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d at 1140 (holding that a reviewing court may not substitute its judgment for the agency's).

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary

1 | Judgment (ECF No. 26) is DENIED.
2 |     IT IS FURTHER ORDERED that Defendants' Cross-Motion for Summary
3 | Judgment (ECF No. 34) is GRANTED.
4 |     The Clerk of the Court is directed to enter judgment accordingly.
6 | DATED THIS 30th day of July 2024.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE